[No. 54290–2.   En Banc.   February 18, 1988.]

THE STATE OF WASHINGTON, *Respondent*, v. MARVIN
STANDIFER, *Petitioner.*

*Scott A. Reiman* of *Seattle–King County Public Defender Association*, for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Donna Wise, Deputy,* for respondent.

BRACHTENBACH, J.—A jury convicted defendant of second degree theft. The trial court granted defendant's motion for arrest of judgment. The State appealed; the Court of Appeals reversed and remanded for entry of judgment. *State v. Standifer,* 48 Wn. App. 119, 737 P.2d 1058 (1987). We reverse the Court of Appeals.

Defendant was charged and convicted under former RCW 9A.56.040(1)(c): "(1) A person is guilty of theft in the second degree if he commits theft of: . . . (c) A credit card". Former RCW 9A.56.010(3) defines credit card:

> any instrument or device, whether incomplete, revoked, or expired, whether known as a credit card, credit plate, charge plate, courtesy card, or by any other name, issued with or without fee for the use of the cardholder in obtaining money, goods, services, or anything else of value, including satisfaction of a debt or the payment of a check drawn by a cardholder, either on credit or in consideration of an undertaking or guarantee by the issuer[.]

The proof showed that defendant stole a Rainier Bank Machine card. The cardholder was an acquaintance of defendant. Defendant had an opportunity to obtain the holder's personal identification number. That machine card permitted access to Rainier's automated teller machine, known as a cash machine. Upon entry of the account number together with a personal identification number, cash could be withdrawn from the depositor's checking account.

The cash machine is linked to an off–site mainframe computer. The programming of the mainframe permits verification of the account number and the personal identification number. If the mainframe computer is functioning, it will not permit a withdrawal in excess of the funds in the account. However, if the mainframe is not functioning, the cash machine will still dispense cash even though it creates an overdraw on the account, which happened here. The data in the cash machine is stored and then passed into the

mainframe when the mainframe is back on line. If the mainframe is operational, an attempted withdrawal in excess of funds in the account will not succeed and the card is retained by the machine. If there is an overdraft, the bank customer is liable for the excess withdrawal pursuant to a depositor's agreement executed when the customer opened the account.

For purpose of this case, the operative language of the statute is as follows: Credit card means "[1] any instrument . . . whether known as a credit card . . . or by any other name . . . [2] issued . . . for the use of the cardholder in obtaining money . . . either [3] on credit or [4] in consideration of an undertaking or guarantee by the issuer . . ." Factors 1 and 2 are obviously present. The question is whether these facts satisfy the third or fourth element. Was the card used to obtain money on credit or in consideration of an undertaking by the bank?

Defendant contends: (1) the statute defining "credit card" is not ambiguous and does not include a cash machine card; (2) alternatively, if the statute is read to potentially include this type card, it is ambiguous and must be construed in favor of the defendant; and (3) the statute, as construed by the Court of Appeals, is a denial of due process for failure to give fair notice of what is proscribed. If the statute is not ambiguous and does not include the transactions by Standifer using the bank card, no further issues need be considered.

■■ In dissecting the statute to determine whether these facts constitute a crime, our objective and authority is to ascertain legislative intent as expressed in the statute. *State v. Bernhard,* 108 Wn.2d 527, 533, 741 P.2d 1 (1987). If the language is not ambiguous, there is no need for judicial interpretation. *State v. Theilken,* 102 Wn.2d 271, 275, 684 P.2d 709 (1984). Words are given the meaning provided by the statute or, in the absence of specific definition, their ordinary meaning. *Theilken,* at 276; *State v. Bodey,* 44 Wn. App. 698, 703, 723 P.2d 1148 (1986).

We turn first to the State's argument that one function of the cash machine card is to obtain money on credit because it is possible to obtain cash in excess of the account balance if the mainframe computer is down. The applicable statutory element on this point is that the card be "issued . . . for the use of the cardholder in obtaining money . . . on credit . . ." It is clear that the card was not issued for use of the cardholder to obtain money on credit. The testimony was that access to the cash machine was not intended to permit such withdrawals. Such was possible only by the fortuitous circumstance of the mainframe being off line for a few minutes. Certainly the card was not issued for the use of the cardholder to obtain funds in excess of the account balance. The statute is not ambiguous as to obtaining money on credit; the cash machine card does not fit that statutory language.

The second and separate prong of the State's argument is that the access card, in the words of the statute, "is issued . . . for the use of the cardholder in obtaining money . . . in consideration of an undertaking . . . by the issuer". There is no evidence in the record of a legally binding "undertaking" by the issuer of the card. The contractual terms under which the bank issued the access card are not in evidence. The State contends that making available the cash machine, allowing the cardholder to thereby access the deposit, and allowing a possible overdraw constitute the bank's "undertaking."

There is no statutory definition of undertaking. Therefore we give the word its usual and ordinary meaning. The applicable dictionary definition is a "pledge, promise, guarantee;" specifically, "a promise or security required by law". *Webster's Third New International Dictionary* 2491 (1976). There is no proof of an undertaking by the issuing bank which would meet this definition, nor does the evidence support an inference of such undertaking. Common experience indicates that this portion of the statute was intended to describe the card issued by a bank with which the holder can obtain money, goods or services from a seller

or provider thereof in consideration of the issuer's promise to pay the seller or provider, then looking to the cardholder for payment. Clearly the transactions in question do not fit the statutory criteria.

Buttressing our conclusion that the statute did not describe the charged crime are the 1987 amendments to RCW 9A.56.010 and .040. Laws of 1987, ch. 140, § 1(3) strikes the words "credit card" and substitutes "access device" in RCW 9A.56.010. The theft statute is amended by a similar substitution. The definition of an "access device" clearly would include the type of cash withdrawal involved here.

■ An amendment of an unambiguous statute generally reflects an intent to change the law. *Vita Food Prods., Inc. v. State,* 91 Wn.2d 132, 134, 587 P.2d 535 (1978). The presumption of intent to change existing law may be rebutted if circumstances indicate a legislative intent to interpret, rather than change, existing law. *Bowen v. Statewide City Employees Retirement Sys.,* 72 Wn.2d 397, 403, 433 P.2d 150 (1967). The substantial nature of the new definition of the type of card covered indicates an intent of change far beyond interpretation. This conclusion is consistent with the House Bill Report on the proposed legislation:

> Technology has significantly changed banking practices. The term "credit card" does not adequately define many of the mechanisms that allow people to obtain access to credit and checking accounts. Changing the definition will make it easier for prosecutor's [*sic*] to establish certain types of fraudulent transactions.

House Bill Rep. 508, at 2, 50th Legislature (1987).

The Court of Appeals is reversed.

PEARSON, C.J., and UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.