[No. 43569-8-I. Division One. November 1, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. PHILLIP LYNCH
SCHLOREDT, *Appellant*.

790

*Rita J. Griffith* of *Griffith & Cole, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Erin E. Ehlert, Deputy*, for respondent.

ELLINGTON, J. — When Phillip Schloredt was apprehended in a convenience store stealing cigarettes, he had stolen credit cards in his pocket. He was convicted of burglary in

the second degree and four counts of possession of stolen property (specifically, stolen "access devices") in the second degree. We affirm Schloredt's conviction, holding that the evidence was sufficient to establish the cards were access devices; that Schloredt received sufficient notice of the charges against him; and that an improper jury instruction on the burglary charge was harmless error under *State v. Deal*.[1] We also hold that the trial court did not rely on an impermissible basis in refusing to impose an exceptional mitigated sentence based upon Schloredt's mental illness.

## Facts

On January 10, 1998, at approximately 4:56 A.M., Seattle Police Officer Steven Strand responded to a call at the J&P Food Center. As he approached, he noticed a broken window at the front of the store, so he backed his car away and looked inside through binoculars. Strand could see someone behind the counter taking cigarettes from the overhead shelf and putting them in some kind of bag.

Strand approached the store on foot. There was a car parked in front with its motor running. Officer John Pote arrived on the scene and the two officers entered the store. Strand ordered the individual to the ground, and required him to remove the maroon scarf and goggles he was wearing. The individual in the store was eventually identified as Phillip Schloredt. Schloredt told Strand there was one other person in the store, but Strand and Pote found no one else inside. Schloredt also told Strand that he had given another person a ride and had not known there would be a burglary.

Strand found bags of cigarettes and an unplugged VCR sitting on a chair. A search of Schloredt revealed nine credit cards in his pocket, bearing the names of Adam Dick and

---

[1] 128 Wn.2d 693, 911 P.2d 996 (1996).

Cecilia Asencio. On the way to the precinct, Schloredt asked Strand if he thought he had a lot of cigarettes, and indicated that he intended to sell the cigarettes for a dollar each and then use the money to buy drugs. Schloredt told Strand that he found the credit cards in a phone booth outside the store just before he went inside.

The owner of J&P Food Center, Jong Soo Kim, testified that he closed the store at approximately 9:00 P.M. on January 9, 1998. When he left, the front door was locked, no windows were broken, and the VCR was located under the counter and plugged in. Two days before the burglary, Cecilia Asencio's vehicle was broken into and a duffel bag containing her credit cards was stolen. That same day, someone broke into Adam Dick's vehicle and took his credit cards.

Schloredt was charged with one count of burglary in the second degree and four counts of possession of stolen property in the second degree. A jury convicted Schloredt as charged. The trial court denied Schloredt's request for a mitigated exceptional sentence, and imposed a sentence within the standard range.

## Discussion

### A. Access Devices

 Schloredt contends there was insufficient evidence to establish all the elements of the possession of stolen property charges.[2] The information charged Schloredt with possession of stolen credit cards in violation of RCW 9A.56.160, which prohibits possession of stolen "access devices."

RCW 9A.56.010(1) defines "access device" as:

any card, plate, code, account number, or other means of ac-

---

[2]The "to convict" instructions for possession of stolen property given to the jury stated that the following elements must be proved beyond a reasonable doubt: (1) that the defendant knowingly possessed stolen property; (2) that the defendant acted with knowledge that the property had been stolen; (3) that the defendant withheld or appropriated the property to the use of someone other than the true owner or person entitled thereto; and (4) that the stolen property was an access device. *See* RCW 9A.56.160.

count access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument[.]

Schloredt asserts that the State failed to establish that the cards found in Schloredt's possession were "access devices" because it failed to prove they were "operational" on the date Schloredt possessed them.

Schloredt argues that the language "can be used" in the definition of access device requires the State to prove the stolen cards remained active at the time of their discovery in his pocket. Schloredt emphasizes the present tense used in the definition, as well as legislative history.

In 1987, the legislature substituted the term "access device" for "credit card,"[3] broadening the statute to account for changing technology in banking practices and to " 'make it easier for prosecutor's [sic] to establish certain types of fraudulent transactions.' "[4]

Schloredt asserts that because the former definition of credit card included the phrase "whether incomplete, revoked, or expired," while the new definition of "access device" does not, the legislature "decriminalized" possession of an incomplete, revoked, or expired credit card. He thus argues that the State is required to prove the credit cards in his possession were not "incomplete, revoked, or expired," and that the evidence was insufficient to establish this "element." In particular, he argues the State failed to prove the owners of the cards had not cancelled them upon discovering the thefts. Under Schloredt's reading of the statute, such an act by the victim removes the cards from the definition of access device.

---

[3]Former RCW 9A.56.010(3) (1985) defined "credit card" as "any instrument or device, whether incomplete, revoked, or expired, whether known as a credit card, credit plate, charge plate, courtesy card, or by any other name, issued with or without fee for the use of the cardholder in obtaining money, goods, service, or anything else of value . . . ."

[4]*State v. Standifer,* 110 Wn.2d 90, 94, 750 P.2d 258 (1988) (quoting H.B. Rep. 508, at 2, 50th Leg., Reg. Sess. (Wash. 1987)).

■ Schloredt's argument is without merit. A reviewing court will not give a hypertechnical reading of a statute so as to yield an absurd result.[5] It begs reason to assume the legislature intended that a defendant could not be charged with possessing a stolen credit card or other access device solely because the victim discovered the theft and cancelled the account on the stolen card before the defendant was apprehended. Nor does the history of the statutory definition aid Schloredt's argument. The legislature's failure to incorporate into a new definition certain characteristics that were part of the definition it has abandoned and replaced does not have the effect of transforming the absence of these characteristics into an element of the new definition. This is gymnastics, not statutory construction, and we decline Schloredt's invitation to assume the legislature intended to engage in such contortions in writing a simple definition. The clear legislative intent of the language "can be used" in RCW 9A.56.010(3) is a reference to the status of the access device when last in possession of its lawful owner. It does not reference the status of the device when later located in unauthorized hands.

Schloredt was apprehended on January 10, 1998, and in his pocket police found credit cards in the names of Adam Dick and Cecilia Asencio. Both victims testified that their credit cards were stolen on January 8, 1998. At the time they were stolen, none of the cards had expired. The State did not specifically ask either victim whether the cards were active when stolen, but the testimony of each victim, in context, was sufficient to justify that conclusion, and there was no evidence to the contrary. The jury was thus entitled to find, as it was instructed it must do to convict, that the cards met the definition of an "access device." Whether the victims cancelled their accounts prior to Schloredt's arrest is irrelevant.

B. Notice

■ We likewise reject Schloredt's assertion that he

[5]*Pudmaroff v. Allen*, 138 Wn.2d 55, 65, 977 P.2d 574 (1999).

received insufficient notice of the possession of stolen property charges because the term "credit card" instead of "access device" was used in the charging document.[6] At the outset, we note that Schloredt did not object to any of the charging documents until his appeal. An information challenged initially on appeal will be construed "quite liberally."[7]

▪ In interpreting an information, it is not necessary that the exact words of the statute be used in the charging document, so long as sufficient words were used to convey the same meaning.[8] The inquiry is whether the elements appear in any form, or by fair construction can be found in the information.[9]

Although the information did not explicitly use the words "access device," it referred to RCW 9A.56.160(1)(c), the statutory provision dealing with possession of stolen access devices, and also to Schloredt's possession of stolen credit cards. Therefore, the information is more specific than it would have been had it merely charged Schloredt with possession of a "stolen access device" without identifying what particular access device was found in his possession. Schloredt received sufficient notice of the charges against him.

## C. Improper Jury Instruction

▪ Schloredt challenges the constitutionality of the court's jury instruction on burglary, which stated:

---

[6]Schloredt was charged in Count II (Possession of Stolen Property) of the Amended Information with the following:

> That the defendant . . . on or about January 10, 1998, did knowingly receive, retain, possess, conceal and dispose of a stolen credit card, to-wit: American Express card, issued to Cecilia Asencio, knowing that such property had been stolen and did withhold and appropriate the same to the use of a person other than Cecilia Asencio, the true owner and person entitled thereto;

> Contrary to RCW 9A.56.160(1)(c) and 9A.56.140(1). . . .

Counts III through V used the same language with respect to the other credit cards and the other victim.

[7]*State v. Moavenzadeh*, 135 Wn.2d 359, 362, 956 P.2d 1097 (1998).

[8]*Id.* (quoting *State v. Kjorsvik*, 117 Wn.2d 93, 108, 812 P.2d 86 (1991)).

[9]*Id.*

> A person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein *unless such entering or remaining shall be explained by evidence satisfactory to the jury to have been made without such criminal intent.* This inference is not binding upon you and it is for you to determine what weight, if any, such inference is to be given.

(Emphasis added.) Schloredt correctly points out that the instruction created a mandatory presumption, which shifted the burden of proof to the defendant and thereby unconstitutionally relieved the State of its duty to prove all the elements of the crime beyond a reasonable doubt. The State concedes that the jury instruction was improper. The only question is whether the error was harmless. We hold it was, because there is no doubt the jury would have found Schloredt guilty of burglary even if the improper instruction had not been given.

In *State v. Deal*,[10] our Supreme Court considered an identical instruction and held it improperly shifted the burden to the defendant to produce evidence that he entered the premises without criminal intent. The court nevertheless concluded the error was harmless, because by his own admission, the defendant was unlawfully on the premises with intent to commit assault, so the jury would necessarily have found him guilty anyway.[11]

The same is true here. Schloredt was apprehended in the J&P Food Center, where a window had been broken to gain entry. Officer Strand watched him putting cigarettes into a bag. On his way to the precinct, Schloredt asked Strand if he thought he had gotten a lot of cigarettes, and stated that he intended to sell them for a dollar each. Thus, by his own admission, Schloredt remained unlawfully on the premises with the intent to steal cigarettes.

[10] 128 Wn.2d 693, 911 P.2d 996 (1996).

[11] *Id.* at 703.

Schloredt contends, however, that *State v. Jackson*[12] stands for the proposition that an instruction which improperly relieves the State of its burden of proving every essential element of guilt beyond a reasonable doubt is never susceptible to harmless error analysis. *Jackson* does contain a statement which, taken out of context, can be read to that effect:

> In the final analysis, the instruction relieved the State of its burden of proving every essential element of guilt beyond a reasonable doubt because it allowed the jury to find the Jacksons, or either of them, guilty as an accomplice to felony murder by virtue of their failure to protect their foster child. The instruction, therefore, is not susceptible to harmless error analysis.[13]

We disagree with Schloredt's reading of *Jackson*. The court did not hold that errors relieving the State of its burden of proving every essential element of guilt beyond a reasonable doubt are never subject to harmless error analysis. Rather, the court conducted a harmless error analysis. In fact, the second section of the opinion is entitled "Harmless Error."

The challenged jury instruction in *Jackson* addressed accomplice liability. The Supreme Court found that the instruction expanded the definition of accomplice liability contrary to legislative intent, essentially creating omission liability—that is, criminal liability for a parent's failure to come to the aid of his or her child. The court found it was impossible to discern what result the jury would have reached on proper instructions:

> While it is conceivable that the jury found that one or both of the Jacksons was a principal, rather than an accomplice, we do not know that for certain[.]
>
> . . . [I]t is impossible to discern from the interrogatories

---

[12]137 Wn.2d 712, 976 P.2d 1229 (1999).

[13]*Id.* at 727 (citing *State v. Eastmond*, 129 Wn.2d 497, 503, 919 P.2d 577 (1996) and *State v. Byrd*, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995)).

whether, [if the jury found accomplice liability,] it was by virtue of their "mere presence and knowledge of the criminal activity," pursuant to the erroneous instruction, or whether it was pursuant to the appropriate statutory standard for accomplice liability.[14]

In concluding that the error in the accomplice instruction was "not susceptible to a harmless error analysis," the *Jackson* court cited two cases: *State v. Eastmond*[15] and *State v. Byrd*.[16] In *Byrd*, the court reversed because the jury instructions failed to set forth an essential element of the crime (i.e., specific intent either to create apprehension of bodily harm or to cause bodily harm). In *Eastmond*, the court again considered trial instructions that omitted the same essential element, and again held such omission to be "fatal error."[17]

The *Eastmond* court discussed the proper approach for an appellate court considering a claim of constitutional error raised for the first time on review: "Upon deciding the error at issue rises to a constitutional level sufficient for review, we next examine whether the trial court committed reversible error to permit relief."[18] For this proposition, the court cited *State v. Scott*, which contains the Supreme Court's holding as to the proper review of a claimed manifest constitutional error—the final step of which is a harmless error analysis.[19] The underpinnings of the *Jackson* court's analysis are thus inconsistent with Schloredt's interpretation of its holding.

While a complete failure to identify elements cannot be

---

[14]*Id.*

[15]129 Wn.2d 497, 503, 919 P.2d 577 (1996).

[16]125 Wn.2d 707, 713-14, 887 P.2d 396 (1995).

[17]*Eastmond*, 129 Wn.2d at 503. In still a later case, *State v. Smith*, 131 Wn.2d 258, 265, 930 P.2d 917 (1997), the court confirmed the holdings of *Eastmond* and *Byrd*, and held that failure to instruct on an essential element of the crime requires automatic reversal.

[18]*Eastmond*, 129 Wn.2d at 503.

[19]*State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

harmless, the potential for burden shifting resulting from improper presumption instructions can and should be subject to such an analysis. The fundamentals are before the jury, and the improper instruction relieves the State of its burden not because the jury is left unaware of that burden, but rather because the jury is given an improper impression as to the weight of certain evidence. The instruction thus affects evaluation of evidence, not identification of essential elements.

As the U.S. Supreme Court held in *Sullivan v. Louisana*[20] the inquiry in harmless error review is not just whether the guilty verdict would have been rendered without the error, but whether the verdict surely cannot be attributed to the error. In *Sullivan*, an improper reasonable doubt instruction had been given. The Court reviewed the application of harmless error analysis to constitutional errors:

> In *Chapman v. California*, 386 U.S. 18[, 87 S. Ct. 824, 17 L. Ed. 2d 705, 24 A.L.R.3D 1065] (1967), we rejected the view that all federal constitutional errors in the course of a criminal trial require reversal. . . . Although most constitutional errors have been held amenable to harmless-error analysis . . . , some will always invalidate the conviction. . . .
>
> . . . [T]he question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.[21]

The *Sullivan* Court went on to consider the specific question of burden-shifting errors:

> Insofar as the possibility of harmless-error review is concerned, the jury-instruction error in this case is quite different from the jury-instruction error of erecting a presumption regarding an element of the offense. A mandatory presumption—for example, the presumption that a person

---

[20]508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

[21]*Id.* at 278-79 (citations omitted).

intends the ordinary consequences of his voluntary acts—violates the Fourteenth Amendment, because it may relieve the State of its burden of proving all elements of the offense. But when a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt. And when the latter facts are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed. A reviewing court may thus be able to conclude that the presumption played no significant role in the finding of guilty beyond a reasonable doubt.[22]

Such is the case here. The instructions correctly identified the elements. To find the defendant guilty, the jury had to find the predicate facts—that is, that Schloredt entered or remained unlawfully in the building. But the court gave an improper burden-shifting instruction, which potentially relieved the State of its burden of proof on the element of intent. This is not the same as entirely failing to identify the essential elements for the jury's consideration. Schloredt admitted his intent to steal. As in *State v. Deal*, therefore, we can say here that the verdict is surely unattributable to the error, and therefore that the error is harmless.

Returning to our discussion of *Jackson*, the court's remark that "[t]he instruction, therefore, is not susceptible to harmless error analysis"[23] appears to represent the court's conclusion that because the facts found by the jury could not be ascertained, the instruction given in *Jackson* was indeed not subject to harmless error analysis.[24] We are confident that the *Jackson* court meant no broad change in traditional harmless error analysis for other kinds of jury-instruction errors, where the jury has necessarily found the predicate facts beyond a reasonable doubt.

[22]*Id.* at 280-81 (internal quotations and citations omitted).

[23]*Jackson*, 137 Wn.2d at 727.

[24]*See Sullivan*, 508 U.S. at 280-81.

We note further that the *Jackson* opinion never mentions *Deal*, despite the fact that the same justice authored both opinions. And finally, nothing whatsoever in the *Jackson* opinion evidences an intent on the part of the court to overrule a long-established line of harmless error case law. We therefore follow *Deal*, and find the instruction harmless.

## D. Exceptional Sentence

■ Ordinarily, a defendant may not appeal from a standard range sentence.[25] Appellate review is permissible only in limited circumstances, where the trial court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.[26] "[A] trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling."[27]

At sentencing, Schloredt requested an exceptional sentence below the standard range on the basis that his mental illness was a "failed defense,"[28] which constituted a mitigating factor pursuant to RCW 9.94A.390(1)(e).[29] Schloredt presented a letter from Dr. Victor J. Burnstein, who opined that Schloredt suffers from a major depressive disorder with psychotic features as well as a borderline personality disorder which impaired his capacity to ap-

---

[25]RCW 9.94A.210(1); *State v. Mail*, 121 Wn.2d 707, 710, 854 P.2d 1042 (1993).

[26]*State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997), *review denied*, 136 Wn.2d 1002, 966 P.2d 902 (1998).

[27]*Id.*

[28]The Sentencing Reform Act of 1981 provides that certain "failed defenses" may constitute mitigating factors supporting an exceptional sentence below the standard range. RCW 9.94A.390; *State v. Hutsell*, 120 Wn.2d 913, 921, 845 P.2d 1325 (1993). Schloredt's claim of mental illness was raised for the first time at the sentencing hearing.

[29]RCW 9.94A.390(1)(e) states that one of the mitigating factors which the court may consider when exercising its discretion to impose an exceptional sentence is whether "[t]he defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law, was significantly impaired (voluntary use of drugs or alcohol is excluded)."

preciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, and without which his capacity would not have been significantly impaired. The trial court found that Schloredt suffers from a major depressive disorder with psychotic features, but denied Schloredt's request for an exceptional sentence downward. Among the court's remarks was the following comment: "[T]here simply isn't evidence by a preponderance of the evidence that the *only* cause to this behavior in January of '98 was his mental illness. *If I could make such a finding, then I do believe the law would allow the exceptional sentence that is being sought today.*" (Emphasis added.) Schloredt contends on appeal that the court erred in its belief that it could not exercise its discretion to grant an exceptional sentence unless his mental illness was the *only* factor contributing to his criminal behavior, and that because of this error of law, the court relied on an impermissible basis for refusing a mitigated sentence. We do not, however, think the court intended to express such a belief.

■ While mental conditions not amounting to insanity or diminished capacity may constitute mitigating factors supporting an exceptional sentence below the standard range, the record must establish not only the existence of the mental condition, but also the requisite connection between the condition and significant impairment of the defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law. *State v. Rogers.*[30] The court here specifically stated:

> I do not find as a matter of law that the defendant's depressive disorder with psychotic features impaired his capacity on the dates of these offenses to appreciate the wrongfulness of his behavior[,] nor do I find they seriously compromised his ability to control his actions.

In essence, the court rejected Dr. Burnstein's evidence. It thus appears that in context, the court's reference to "the only cause" was hypothetical. While the court's hypotheti-

---

[30]*See State v. Rogers*, 112 Wn.2d 180, 185, 770 P.2d 180 (1989).

cal remark may have injected some confusion, the court's actual ruling, quoted above, reveals application of the correct test under *Rogers*. We see no basis for believing the court misunderstood the applicable law. The court considered Schloredt's request, and examined the evidence. Having found that the defendant's mental illness did not impair his capacity, the court correctly declined his request for an exceptional sentence. The court did not rely on an impermissible basis, and Schloredt's sentence is not appealable.[31]

Affirmed.

KENNEDY, C.J., and BECKER, J., concur.

---

[31]*See Garcia-Martinez*, 88 Wn. App. at 331.