195 P.3d 1008 (2008)
STATE of Washington, Respondent,
v.
Steven K. CHANG, Appellant.
No. 60743-0-I.
Court of Appeals of Washington, Division 1.
November 17, 2008.
*1009 Eric Nielsen, Nielsen Broman Koch, Seattle, WA, for Appellant.
Heidi J. Jacobsen-Watts, King County Prosecuting Attorney, Seattle, WA, for Respondent.
BECKER, J.
¶ 1 The convictions appealed by Steven Chang arose from a search of his car. Because the officers had information there was a gun in the car, the warrantless search was appropriate to protect their safety. And Chang's convictions for possession of a stolen access device were supported by his possession of checking account numbers. Because checking account numbers can be used to access accounts in nontraditional ways not involving paper checks, they do not fall within the statutory exclusion for devices that can be used to initiate a transfer of funds "solely by paper instrument."

FACTS
¶ 2 Police responded to a report of a suspected forgery at a bank. Inside the bank, the suspect told them he had arrived at the bank in a white Subaru driven by Steven *1010 Chang. Some of the officers found Steven Chang in a white Subaru in the parking lot and detained him. Meanwhile, asked whether there were any weapons on Chang or in the Subaru, the suspect inside the bank told police that Chang had a handgun. This information was relayed via radio to the officers outside, who had already removed Chang from the Subaru. One of the officers patted Chang down and handcuffed him, then looked inside the car and saw a bulge under the driver's side floor mat. Reaching in, he pulled back the floor mat and immediately saw a handgun on the floorboard. Chang denied ownership of the gun. He was placed under arrest for carrying a concealed weapon.
¶ 3 The police searched the interior of Chang's car incident to arrest. They found a backpack in the rear seat. Inside were several bank checks with different names on them, a small quantity of drugs, and several documents bearing Chang's name and personal information. Police also found a small quantity of marijuana and a methamphetamine pipe in the center console.
¶ 4 The State charged Chang with three counts of possession of stolen property in the second degree for the checking account numbers in his possession, unlawful possession of a firearm in the second degree, and two counts of drug possession.
¶ 5 Chang moved to suppress the checks, the handgun, and the drugs. The court denied the motion, concluding that the warrantless search was justified by officer safety concerns.
¶ 6 After the State rested, Chang moved to dismiss the counts of possession of stolen property, arguing that the checks were not access devices under RCW 9A.56.010(1) because they were paper instruments. The trial court denied the motion. The jury convicted Chang as charged. He appeals.

SEARCH OF VEHICLE
¶ 7 Chang assigns error to the denial of his motion to suppress. He correctly notes that the trial court did not enter CrR 3.5 and 3.6 findings until after he filed his appellate brief. When findings and conclusions are not entered until after the appellant files his brief, his opportunity to assign an error to a finding of fact is foreclosed. But there is no error if the trial court's oral findings are sufficient to permit appellate review, and the defendant does not demonstrate any prejudice arising from the belated findings. State v. Glenn, 140 Wash.App. 627, 639-40, 166 P.3d 1235 (2007). That is the case here.
¶ 8 The trial court's ruling on a motion to suppress evidence must be affirmed if substantial evidence supports the court's findings of fact, and those findings support the court's conclusions of law. State v. Ross, 106 Wash.App. 876, 880, 26 P.3d 298 (2001). Here, Chang does not challenge the findings of fact. The trial court's conclusion of law is reviewed de novo. Ross, 106 Wash. App. at 880, 26 P.3d 298.
¶ 9 The court found that when Chang was detained, he was standing at the rear driver's side bumper area of his car and about two strides from the driver's side door. Upon receiving the information that Chang had a gun, an officer patted Chang down and handcuffed him, then looked inside the car and found the gun under the floor mat. The gun was loaded, and the officer removed and secured it.
¶ 10 The protective search exception to the warrant requirement applies when a valid Terry stop includes a vehicle search to ensure officer safety. State v. Kennedy, 107 Wash.2d 1, 12, 726 P.2d 445 (1986) citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Larson, 88 Wash.App. 849, 853, 946 P.2d 1212 (1997). If a police officer has a reasonable belief that the suspect in a Terry stop might be able to obtain weapons from a vehicle, the officer may search the vehicle without a warrant to secure his own safety, limited to those areas in which a weapon may be placed or hidden. State v. Holbrook, 33 Wash.App. 692, 696, 657 P.2d 797, rev. denied, 99 Wash.2d 1023 (1983) (protective search was valid when another officer informed the searching officer of an informant's "hot-sheet" information about a hidden gun).
*1011 ¶ 11 In determining whether the search was reasonably based on officer safety concerns, a court should evaluate "the entire circumstances" surrounding the Terry stop. State v. Glossbrener, 146 Wash.2d 670, 679, 49 P.3d 128 (2002). For example, if a suspect made a furtive movement appearing to be concealing a weapon or contraband in the passenger compartment, a protective search is generally allowed. Kennedy, 107 Wash.2d at 12, 726 P.2d 445 (a valid protective search was made when the officer witnessed the driver lean forward in a way that looked like he was hiding something in the front seat of the car); Larson, 88 Wash.App. at 857, 946 P.2d 1212 (when an officer following a speeding driver saw him leaning towards the floorboard, the officer properly searched inside in the area of the furtive movement); Glossbrener, 146 Wash.2d at 679, 49 P.3d 128 (the officer's safety concern based on the driver's furtive movement seen before stopping the car was no longer objectively reasonable at the time of the search because the officer had completed his investigation and the search was an afterthought).
¶ 12 When an officer reasonably believes that a suspect's vehicle contains a weapon, the ability to search is limited to the area "within the investigatee's immediate control." Kennedy, 107 Wash.2d at 12, 726 P.2d 445. In Kennedy, the court applied this reasoning to approve a search where a passenger still remained in the car after the police had removed the driver who made a furtive movement. Chang attempts to distinguish Kennedy by pointing out that he was standing handcuffed outside the car, there was no one inside the car, and therefore no one had immediate access to any gun that might be inside. However, Kennedy "did not limit an officer's ability to search the passenger compartment of a vehicle based on officer safety concerns only to situations in which either the driver or passenger remain in the vehicle." Glossbrener, 146 Wash.2d at 679, 49 P.3d 128. For example, where a lone driver is outside the automobile and has no immediate access to the car, police may conduct a protective search if the suspect will have a later opportunity to return to his vehicle. Larson, 88 Wash.App. at 857, 946 P.2d 1212; Glenn, 140 Wash.App. at 636, 166 P.3d 1235. In Larson, once the suspect was pulled over, the driver was ordered to get out of his truck. In order to obtain his registration, the driver would need to return to his truck. Because of the driver's initial furtive movement raising suspicion that a weapon might be inside the vehicle, the court recognized sufficient grounds for safety concerns to justify the warrantless search by the police. Larson, 88 Wash.App. at 857, 946 P.2d 1212.
¶ 13 Similarly, the court held there was a reasonable officer safety concern in Glenn because the police knew they would have to return Glenn to his car if they found no weapon on his person. Glenn, 140 Wash. App. at 636, 166 P.3d 1235. There, a child told his mother that a man in a passing car had pointed a gun at him from the car window. Based on this report, the police identified Glenn as a suspect and conducted a protective search of his car. This court ruled that a legitimate citizen's report about the gun was sufficient to justify concern about the safety of the officers. Glenn, 140 Wash. App. at 635, 166 P.3d 1235. If the officers had returned Glenn to his car without making sure that the weapon seen by the boy was not inside, "they would not have been ensuring their own safety or that of the surrounding community." Glenn, 140 Wash. App. at 636, 166 P.3d 1235.
¶ 14 Here, as established by the trial court's undisputed findings of fact, the officers were informed that Chang might be connected to the forgery attempt and that he reportedly had a handgun with him. Like Glenn, Chang was handcuffed and standing outside the car, but the police did not necessarily intend to arrest him without further investigation. Without a formal arrest, the police could not detain Chang in handcuffs longer than necessary to investigate his possible connection to the forgery attempt. Securing the scene required ensuring that the reported weapon would not be available to Chang if the police eventually released him to get back in his car. See Glenn, 140 Wash. App. at 636, 166 P.3d 1235.
¶ 15 Because the police had information that Chang had a gun in his car, their safety *1012 concern was reasonable, and the trial court did not err in concluding that the warrantless search was valid. The order denying the motion to suppress is affirmed.

STOLEN ACCESS DEVICE
¶ 16 Chang claims the evidence was insufficient to support his convictions on the charges of possessing a stolen access device. When reviewing a challenge to the sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Hosier, 157 Wash.2d 1, 8, 133 P.3d 936 (2006).
¶ 17 Possession of stolen property means "knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." RCW 9A.56.140(1). A person who possesses a "stolen access device" is guilty of possessing stolen property in the second degree. RCW 9A.56.160(1)(c). Chang claims the evidence of the checks he possessed was insufficient to support a conviction because the statutory definition of "access device" contains an exclusion for paper instruments.
¶ 18 At trial, the State presented the testimony of three witnesses whose checking account numbers were found in Chang's backpack during the search incident to his arrest. The first witness was shown two checks admitted as one of the State's exhibits. He said they had been in a checkbook that disappeared when someone broke into his vehicle while it was parked at a trailhead. He testified that the account number on the checks was the account number for his investment account. The second witness was shown two checks that he testified bore the account number of his credit union checking account. He said they were printed on different stationery, without the credit union watermark. He recalled that he had once written a check to pay his water bill, but the water company did not receive it. He later learned that a check with the same number but in a larger amount had cleared through the credit union. The third witness was shown a check that she identified as having the same account number as one of her current accounts. All three witnesses testified that Chang did not have permission to possess the checks.
¶ 19 Chang claims the evidence of the checks he possessed was insufficient to support a conviction because the statutory definition of "access device" contains an exclusion for paper instruments such as checks. The State responds that Chang was convicted of possession of the account numbers on the checks, not the checks themselves. The State charged Chang with possessing stolen account numbers, not stolen checks, and the State elicited testimony from the victims that they recognized the account numbers that were on the checks. Contrary to Chang's argument, it was not the checks but rather the account numbers on the checks that the State relied on as proof of the charge.[1] The question, then, is whether account numbers on checks satisfy the definition of "access device."
¶ 20 The statute defines access device as:
any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument.

RCW 9A.56.010(1) (emphasis added).
¶ 21 Questions of statutory interpretation are reviewed de novo. Western Telepage v. City of Tacoma, 140 Wash.2d 599, 607, 998 P.2d 884 (2000). A court's objective in construing a statute is to determine the legislature's intent. If a statute's meaning is plain on its face, the court must give effect to that *1013 plain meaning as an expression of legislative intent. Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole. State v. Elmore, 143 Wash.App. 185, 188, 177 P.3d 172 (2008).
¶ 22 As originally enacted in 1975, RCW 9A.56.010 was focused on credit cards. Laws of 1975, 1st Ex.Sess., ch. 260, § 9A.56.010, eff. July 1, 1976. The Washington legislature amended the statute in 1987, substituting the phrase "access device" for "credit card." State v. Standifer, 110 Wash.2d 90, 94, 750 P.2d 258 (1988). Standifer quoted a bill report which explained that the amendment was intended to keep up with changes in technology:
Technology has significantly changed banking practices. The term "credit card" does not adequately define many of the mechanisms that allow people to obtain access to credit and checking accounts. Changing the definition will make it easier for prosecutors to establish certain types of fraudulent transactions.
State v. Standifer, 110 Wash.2d at 94, 750 P.2d 258, quoting House Bill Rep. 508, at 2, 50th Legislature (1987). In the same enactment, the legislature added the phrase "other than a transfer originated solely by paper instrument" to the end of the definition of access device. Laws of 1987, ch. 140, § 1(3).
¶ 23 On its face, the statute includes account numbers among the items defined as access devices. This court has had no difficulty concluding that a credit card number is, by itself, an access device. See e.g., State v. Askham, 120 Wash.App. 872, 885, 86 P.3d 1224, rev. denied, 152 Wash.2d 1032, 103 P.3d 201 (2004). But here the question is complicated by the "paper instrument" exclusion at the end of the definition. Washington courts have not addressed the meaning of this exclusion, but it has been a topic of discussion in federal cases, and we look to them for insight into its meaning.
¶ 24 The legislative history of an analogous federal statute strongly suggests that our legislature was attempting to be consistent with the federal scheme. A federal criminal statute enacted in 1984 has an analogous definition of "access device" and the same "paper instrument" exclusion:
any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).
18 U.S.C. § 1029(e)(1) (emphasis added).
¶ 25 Subject to the above definition of access device under subsection (e)(1), 18 U.S.C. § 1029 criminalizes the use of counterfeit access devices, the use of unauthorized access devices where during a one-year period anything of value aggregating $1,000 or more is obtained, the knowing possession of 15 or more counterfeit or unauthorized access devices, and the knowing possession or use of device-making equipment. 18 U.S.C. § 1029(a)(1)-(4).
¶ 26 In the 1984 legislation, Congress attempted to expand the scope of access device broadly enough to encompass future technological changes just as the Washington legislature did in the 1987 amendment to RCW 9A.56.010. Congressional hearings documented the intent:
There are indications of a growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts called debit instruments. . . . There are also indications that thieves are becoming increasingly sophisticated and in fact are stealing account numbers and using them without even getting physical control of the cards themselves.
H.R.Rep. No. 98-894, 98th Cong., 2nd Sess. at 4 (1984), reprinted in 1984 U.S.C.C.A.N. 3689, 3690. As to the definition of "access device", the congressional report states that the definition "is broad enough to encompass future technological changes." 1984 U.S.C.C.A.N., supra, at 3705. According to *1014 the report, the only limitationi.e., the one relating to paper instruments"excludes activities such as passing forged checks." 1984 U.S.C.C.A.N., supra, at 3705.
¶ 27 Considering this history of the federal statute, a federal circuit court has concluded that Congress wished to zero in on major counterfeiting and trafficking activities without supplanting state and local regulation of less sophisticated schemes of forgery and fraud. United States v. Hughey, 147 F.3d 423, 434 (5th Cir.1998).
¶ 28 In Hughey, the defendant was charged under the federal statute with use (not possession) of an unauthorized access device. The conduct for which he was charged consisted of completing, presenting and cashing counterfeit checks. His conviction on this count was reversed, the court holding that his conduct concerned only transfers "originated solely by paper instrument", which was "not within the ambit of the conduct that Congress sought to prohibit." Hughey, 147 F.3d at 435. The government argued that Hughey's conviction on this count should nonetheless be affirmed on the basis that he was in possession of the checking account numbers which had the "inherent potential for use with other devices." Hughey, 147 F.3d at 435. The court rejected this argument, stating that it ignored the plain text of the exclusion. "Hughey used the account numbers to originate a transfer solely by paper instrument. Hughey did not use the subject account numbers independently to gain account access." Hughey, 147 F.3d at 435.
¶ 29 The "paper instrument" exception was also at issue in United States v. Tatum, 518 F.3d 769 (10th Cir.2008). In Tatum, the defendant was convicted of uttering a counterfeit check with the intent to deceive an organization in violation of 18 U.S.C. § 513(a). The trial court imposed a sentencing enhancement because it concluded that the defendant's conduct involved "production or trafficking of any access device," which requires sentencing enhancement under the federal sentencing guidelines. Tatum, 518 F.3d at 771. The Tenth Circuit reversed, following Hughey:
We agree with the Fifth Circuit's reasoning. The statutory definition of access devices unambiguously excludes "transfer[s] originated solely by paper instrument," which is precisely the conduct involved in Defendant's offense. The government introduced no evidence that Defendant used, possessed, produced, or trafficked in bank account numbers in any way except as part of his scheme to pass counterfeit checks. We therefore conclude that both the counterfeit checks and the account numbers printed on those checks fall outside the statutory definition of an access device.
Tatum, 518 F.3d at 772.
¶ 30 The federal cases persuasively show that the statute is not intended for use in cases where a defendant is charged with actually using a paper check to attempt or achieve a transfer of funds. We agree with that interpretation. But Hughey at least suggests that mere possession of checking account numbers is also outside the scope of the statute. Hughey, 147 F.3d at 435-36 ("We are not persuaded that Hughey's mere possession of the numbers, at least without additional evidence demonstrating the possibility of an additional use, is sufficient to overcome the express statutory provision excluding his conduct from the ambit of § 1029"). We regard this statement as dicta not compelled by the plain meaning of the statute. Unlike in Hughey, Chang was charged and convicted solely for his conduct of possessing stolen account numbers. There was no charge, no proof and no argument that he had passed bad checks or that his conduct was part of a scheme to pass bad checks.
¶ 31 Where the State seeks only to prove that a defendant possesses stolen checking account numbers, we conclude considering the ordinary meaning of the language of the exclusion and the statutory scheme as a wholethat the State is not precluded from obtaining a conviction under RCW 9A.56.010(1). While the use of paper checks has long been known as a method of gaining access to bank accounts, today there is also widespread use of devices such as telephones and computers to initiate paperless *1015 banking transactions using account numbers only. The statute permits the State to prosecute those who possess stolen checking account numbers without waiting to see whether there will be an actual attempt at passing bad checks. Where a defendant has actually used or attempted to use a paper instrument to initiate a transfer of funds, the more traditional charges like forgery or fraud remain available as charging options.
¶ 32 Affirmed.
WE CONCUR: AGID and LEACH, JJ.
NOTES
[1] At oral argument, Chang asserted that evidence is insufficient to support a finding that the account numbers on checks are access devices unless there is testimony explaining how money can be obtained from a checking account without paper. We are inclined to agree with the State that the matter is within the common knowledge of jurors. However, the argument was not made in Chang's appellate brief and we will not resolve it here.