[No. 85791-1.   En Banc.]
Argued March 13, 2012.     Decided August 9, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS CRAIG ROSE, *Petitioner*.

*Nancy P. Collins* and *Erin L. Calkins* (of *Washington Appellate Project*), for petitioner.

*Andrew K. Miller, Prosecuting Attorney*, and *Megan A. Killgore, Deputy*, for respondent.

¶1 STEPHENS, J. — Douglas Rose challenges his convictions for unlawful possession of a stolen access device and unlawful possession of a controlled substance. We must decide if a credit card Rose possessed is an "access device" for purposes of RCW 9A.56.010(1). We must also decide whether Rose's arrest—leading to the search of his bag and discovery of the evidence against him—was supported by probable cause. We hold that under these facts, the State did not meet its burden to show that the card in question was an access device under RCW 9A.56.010(1). As to this question, we reverse the Court of Appeals. However, we uphold Rose's arrest on other grounds and affirm the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶2 Richland police officer Tom Croskrey received a call that a possible residential burglary or trespass was in progress. Shortly thereafter, Officer Croskrey came upon Douglas Rose, who matched the description of the burglar. While waiting to hear about the outcome of the burglary call, the officer placed Rose in the back of his patrol car but soon learned the burglary report did not merit further action. However, as Croskrey detained Rose, he noticed a glass tube protruding from Rose's bag. Croskrey thought he could see a white chalky substance on the inside of the tube and thought the tube was consistent with a tool a person could use to ingest drugs. Officer Croskrey arrested Rose for possession of drug paraphernalia. He then searched Rose and found what appeared to be a credit card in the name of Ruth Georges. Rose's possession of the credit card led to a charge of second degree possession of stolen property, specifically a stolen "access device." The white substance in the tube was later revealed to be methamphetamine, and Rose was also charged with unlawful possession of a controlled substance.

¶3 At a bench trial, evidence revealed that Rose had visited Georges in her home shortly before he was appre-

hended by Croskrey. Prior to Rose's arrival, Georges had thrown away a credit card offer she received in the mail that day. The offer included a plastic credit card with an account number and Georges's name printed on it. Georges testified she did not have the $30 needed to activate the account, so she placed the card in an empty cigarette box and threw the box into the trash.

¶4 Rose was convicted of second degree possession of a stolen access device and possession of a controlled substance. Rose appealed his convictions, arguing that the credit card was merely an offer to open an account, not an access device. He also argued that his arrest was invalid because it was based on possession of drug paraphernalia, which is not a crime. Division Three of the Court of Appeals affirmed his convictions in a partially published decision. *State v. Rose*, 160 Wn. App. 29, 31, 246 P.3d 1277 (2011). In the published portion of the decision, the court held that the credit card was an access device. In the unpublished portion, the court held that while the arrest was not properly based on possession of drug paraphernalia, Croskrey nonetheless had probable cause to arrest Rose for possession of a controlled substance. *Id.* ¶¶ 32-35 (unpublished portion) (citing *State v. Huff*, 64 Wn. App. 641, 646, 826 P.2d 698 (1992) (noting that "an arrest supported by probable cause is not made unlawful by an officer's subjective reliance on, or verbal announcement of, an offense different from the one for which probable cause exists"), *review denied*, 119 Wn.2d 1007, 833 P.2d 387 (1992)). Rose petitioned this court for review, which we granted. *State v. Rose*, 172 Wn.2d 1014, 268 P.3d 942 (2011).

## ANALYSIS

¶5 We first consider whether Rose was properly convicted of second degree possession of a stolen access device when the device in question was an unactivated credit card not linked to an existing account. We then consider whether Officer Croskrey had probable cause to arrest Rose.

*Was there sufficient evidence to convict Rose of possession of a stolen access device under RCW 9A.56.010(1)?*

¶6 Rose was convicted under RCW 9A.56.160(1) of second degree possession of a stolen access device. An "access device" is

> any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument.

RCW 9A.56.010(1).

¶7 Rose claims the prosecution failed to prove the card was an access device because the card was not linked to an existing account. Pet'r's Suppl. Br. at 11. The crux of his argument is that the State failed to prove the card could "be used" to obtain something of value. This claim is properly regarded as a challenge to the sufficiency of the evidence.

¶8 Evidence is sufficient to support a finding of guilt if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977)).

¶9 The evidence at trial revealed that Georges received a credit card solicitation in the mail from Master-Card. Included in the offer was an unactivated credit card. It looked like an actual credit card: it had an account number, an account holder name and expiration date print-

ed on its face, and a signature block with a three digit security code on the back. But it was not tied to an existing account, nor was it ever signed. The record reflects that Georges was required to call MasterCard and pay a $30 initiation fee to activate an account and use the card. She did not have the $30 fee, so she threw the card away. The record does not reflect whether there were any other hurdles to activating the account, for example, whether Georges was preapproved or whether any other information such as Georges's birth date or Social Security number would have been required if a person called to activate the account. We must decide whether these facts support a finding that Rose possessed an access device when he possessed the card.

¶10 The State argues, and the Court of Appeals agreed, that the card could have been used to obtain something of value regardless of whether it was activated. *See* Resp't's Suppl. Br. at 15-18. In support of its contention, the State cites to *State v. Clay*, 144 Wn. App. 894, 184 P.3d 674 (2008). In *Clay*, the defendant was found with a Mervyns credit card belonging to Berna B. Llorico, which was signed with Llorico's name on the back. *Id.* at 896. At trial, Llorico testified that she had never seen the card but maintained a single Mervyns account for a number of years, that her account number had changed, and that she had not received her new card. *Id.* Clay argued that the card could not " 'be used' to obtain anything of value because it was never activated." *Id.* at 897.

¶11 The Court of Appeals disagreed. It reasoned that "the statute [RCW 9A.56.010(1)] does not require that the access device be activated." *Id.* at 898.

> While whether a card has been activated by its intended user may be relevant, this fact is not dispositive in determining whether it "can be used." Companies that issue cards and merchants who accept them employ, to widely varying degrees, a variety of security measures, which may or may not include requiring a user to provide personal information in order to

"activate" a card. A credit card may be an "access device" regardless of whether the intended user has activated the card, if the evidence supports a finding that the card could be used in the manner described by RCW 9A.56.010(1).

. . . Although Llorico testified that she had not activated the card, no evidence was offered that would prevent a rational juror from concluding that the card had been, or could be, activated by someone else or used without activation. As noted by the trial court, there was "no testimony that any additional steps needed to be taken to activate that card."

*Id.* at 899. The State argues that this case is indistinguishable from *Clay.* Resp't's Suppl. Br. at 18.

¶12 The State also relies on *State v. Schloredt*, 97 Wn. App. 789, 987 P.2d 647 (1999) and *State v. Chang*, 147 Wn. App. 490, 195 P.3d 1008 (2008). In *Schloredt*, the defendant argued that the State was required to prove the stolen credit cards he possessed were not canceled by the owners after the theft. 97 Wn. App. at 793. He reasoned that if the cards were canceled following their theft, they could not "be used" in the present tense as the statute defining access device contemplates. *Id.* The Court of Appeals rejected his argument. "The clear legislative intent of the language 'can be used' in [former] RCW 9A.56.010(3) [(1997)] is a reference to the status of the access device when last in possession of its lawful owner." *Id.* at 794. In *Chang*, the defendant was found with a number of stolen checks belonging to various individuals. 147 Wn. App. at 498-99. The checks included the bank account numbers of the individuals. *Id.* The Court of Appeals thus considered whether the account numbers were excluded from the " 'access device' " definition by virtue of the statute's exception for transfers initiated solely by paper instrument. *Id.* at 499. It held that the "statute permits the State to prosecute those who possess stolen checking account numbers without waiting to see whether there will be an actual attempt at passing bad checks." *Id.* at 504.

¶13 The State argues that *Schloredt* stands for the proposition that the functionality of the card in the hands of

the defendant is irrelevant and that focusing on this question leads to absurd results. Resp't's Suppl. Br. at 15. Thus, the fact that Rose may not have been able to activate Georges's card should have no bearing on its status as an access device. Similarly, the State argues that because *Chang* instructs that the State need not wait for the defendant to pass bad checks, here "[t]he defendant could have used the account number on the card or unactivated card itself to obtain goods or services; no actual attempt to do so is required by the definition of an access device." Resp't's Suppl. Br. at 16-17.

¶14 Unlike the devices at issue in *Clay*, *Schloredt*, and *Chang*, this card was not linked to an existing, active account, nor was the account holder's name signed on the back. However, federal cases considering the federal analog to RCW 9A.56.010(1) suggest an existing, active account is not necessary if the device can nevertheless be used to obtain something of value. *United States v. Bailey*, 41 F.3d 413, 417-18 (9th Cir. 1994); *United States v. Taylor*, 945 F.2d 1050, 1051 (8th Cir. 1991). In those cases, that question was easily answered because the defendants had benefited from their unauthorized use of the devices at issue. *Bailey*, 41 F.3d at 418; *Taylor*, 945 F.2d at 1051. But here, it is not clear from the record that the credit card Rose took could be used to obtain something of value. The evidence shows that it was unactivated. Report of Proceedings (RP) (June 30, 2009) at 88. The State argues that "[n]ot all merchants have the ability to immediately check the status of a credit card when presented for payment. Many merchants continue to take imprints of the card, then submit the charge slip to the issuing company, rather than sending the information digitally. Had he attempted to do so, the defendant could have used the card to obtain goods or services." Resp't's Suppl. Br. at 17.

¶15 This may be a provable proposition, but the State did not prove it. Although "all reasonable inferences from the evidence must be drawn in favor of the State," *Salinas*,

119 Wn.2d at 201, only so much can be learned by simply looking at the card. It stretches the inference beyond the evidence to conclude that this card could be used to obtain something of value. The finding of fact on the functionality of the credit card was that "[n]o evidence was offered that would prevent the court from concluding that the card could be activated by someone other than Ms. Georges. There was no evidence on that precise point." Clerk's Papers (CP) at 27 (second sentence interlineated by trial judge). This finding points to a lack of evidence and is insufficient to support a conviction. The State bore the burden to prove that the card "can be used" to obtain something of value. On the record here, the State did not meet its burden.[1]

¶16 We hold that there was insufficient evidence to convict Rose of second degree possession of stolen property because the evidence at trial did not show the card in question could be used to obtain something of value.

*Was Rose's arrest supported by probable cause?*

¶17 Officer Croskrey initially detained Rose while investigating a potential burglary in the area. As he was waiting for backup, he handcuffed Rose and secured him in the patrol car. Officer Croskrey then noticed a glass pipe in Rose's bag and placed Rose under arrest for possession of drug paraphernalia. Before trial, Rose brought a CrR 3.6 motion, seeking suppression of the evidence against him on the ground that his detention in the patrol car constituted an arrest for which there was no probable cause. CP at 5-8. The suppression court disagreed, finding that the initial

---

[1] While the trial court in *Clay* relied in part on the absence of testimony " 'that any additional steps needed to be taken to activate that card,' " *Clay*, 144 Wn. App. at 899, the trial court's finding here is distinguishable. In *Clay*, the card in question was already tied to an active account. It was thus reasonable to infer from the evidence that it could be used to obtain something of value, and there was no evidence to the contrary. Here, the card in question was not tied to an existing, active account, so affirmative evidence that it could be used to obtain something of value was necessary under the State's burden of proof.

detention was a permissible *Terry*[2] stop, that no arrest occurred until Officer Croskrey developed probable cause upon noticing the glass pipe with white residue protruding from Rose's bag, and that the arrest was proper. CP at 52-53. There was no issue at the suppression hearing as to whether possession of drug paraphernalia was a proper basis for an arrest.

¶18 Rose points out that although use of drug paraphernalia to ingest a controlled substance is a crime, mere possession of drug paraphernalia is not a crime. *State v. O'Neill*, 148 Wn.2d 564, 584 n.8, 62 P.3d 489 (2003); RCW 69.50.412(1) (criminalizing *use* of drug paraphernalia). And, the use of drug paraphernalia is a misdemeanor offense that must be committed in the officer's presence to make a warrantless arrest. *See* RCW 10.31.100(1) (authorizing exception to the presence rule for misdemeanor warrantless arrest if officer suspects cannabis use). Officer Croskrey did not see Rose use the glass pipe to smoke methamphetamine. Rose is therefore correct that he could not properly be arrested for possession of drug paraphernalia.[3]

¶19 The Court of Appeals held that the arrest was nonetheless valid because the evidence in the record demonstrates probable cause that Rose possessed a controlled substance. *Rose*, 160 Wn. App. ¶¶ 34-35 (unpublished portion). The Court of Appeals relied on *Huff*, which explains that "an arrest supported by probable cause is not made unlawful by an officer's subjective reliance on, or verbal announcement of, an offense different from the one for which probable cause exists." *Huff*, 64 Wn. App. at 646 (relying on cases from the fifth and eighth federal circuits

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[3] In a statement of additional authority filed shortly before oral argument, the State cites Benton County Code (BCC) 6.44.020, which makes it a gross misdemeanor to possess drug paraphernalia with *intent* to use it. This provision is presumably wider in scope than RCW 69.50.412(1). But BCC 6.44.020 was not cited or relied on anywhere in the record or briefing. We decline to decide whether BCC 6.44.020 provided a valid basis for Rose's arrest because the argument was not timely raised.

and our state Courts of Appeal decisions, as well as *State v. Vangen*, 72 Wn.2d 548, 433 P.2d 691 (1967)).

¶20 Following this rule, the Court of Appeals considered that Officer Croskrey testified he saw a chalky white residue in the pipe and explained that the officer could have reasonably believed the residue was an illegal substance, and therefore held that there was probable cause to arrest Rose for possession of a controlled substance. *Rose*, 160 Wn. App. ¶ 35 (unpublished portion).

¶21 Rose counters that the suppression court made no specific finding of fact that the white residue was a controlled substance or that Officer Croskrey had any suspicion that the residue was a controlled substance. He asserts that " '[i]n the absence of a finding on a factual issue we must indulge the preemption that the party with the burden of proof failed to sustain their burden on this issue.' " Pet'r's Suppl. Br. at 12 (quoting *State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997)). Relying on *Armenta*, Rose argues that the Court of Appeals overstepped its authority when it "sua sponte conclude[d] that this residue provided probable cause to arrest Rose for possession of a controlled substance." Pet'r's Suppl. Br. at 17.

¶22 We are not persuaded by Rose's argument. It is true that during the suppression hearing, Officer Croskrey made no mention of whether he had any suspicions about the residue in the pipe. He merely noted that he saw it. The suppression court made no specific finding of fact about what Officer Croskrey may have thought about the white residue. But at the suppression hearing, Rose did not challenge his arrest for possession of drug paraphernalia. The issue at the suppression hearing was whether his initial detention was an arrest unsupported by probable cause. CP at 5-8 (motion to suppress); RP (May 21, 2009) at 2-43. The State responded that the detention was merely a *Terry* stop and that Officer Croskrey then developed probable cause for a possession of drug paraphernalia arrest based on his plain-view observation of the glass pipe with

its white residue. CP at 9-12 (State's response to motion to suppress). Other than their connection to the plain-view observation, the glass pipe and the white residue were not the focus of the hearing. No one seemed to question that those items gave Officer Croskrey sufficient probable cause to arrest.

¶23 In the context of this suppression hearing, therefore, Rose's reliance on *Armenta* is misplaced. *Armenta* cautions that a reviewing court must presume, when a fact finder omits a particular finding of fact, that the party with the burden of proof failed to meet its burden. 134 Wn.2d at 14. This presupposes factual issues in dispute. At Rose's suppression hearing the State's burden of proof was to show that the initial detention was supported by reasonable suspicion and that the possession of drug paraphernalia was supported by probable cause. It carried these burdens, and the trial court made findings to that effect.[4]

¶24 The Court of Appeals relied on the rule in *Huff* to conclude from the circumstances that probable cause existed to arrest Rose for possession of a controlled substance. At trial, while Officer Croskrey was being questioned by defense counsel about the pipe and the residue, the following exchange occurred:

Q. . . . you could tell this was, in your training, that it had residue that you felt was consistent with smoking of some substance?

A. Yes.

Q. Did you know what the substance might have been?

A. I had a suspicion it was either methamphetamines or cocaine.

---

[4] Rose also suggests that the suppression court deliberately entered a finding that the tube contained a "residue," rather than a controlled substance, because Rose's counsel cast doubt on Officer Croskrey's observations. Pet'r's Suppl. Br. at 15-16 (citing RP (May 21, 2009) at 12-14). But counsel's questions at the suppression hearing were designed to cast doubt on whether Officer Croskrey saw anything in the pipe at all, not whether his naked eye could discern the type of residue at the time of arrest. The suppression court found that Officer Croskrey saw white residue in the pipe. CP at 53.

RP (June 30, 2009) at 50-51. The circumstances of the stop and arrest of Rose clearly reflect that Officer Croskrey had a plain view of a glass pipe, with a white residue inside, that in his training and experience he suspected were consistent with drug possession. He said as much at trial. That he did not say so at the suppression hearing simply reflects that this was not an issue at that hearing. We affirm the Court of Appeals and hold that based on the facts actually known to Officer Croskrey at the time of the stop and arrest, probable cause existed for a warrantless arrest for possession of a controlled substance. *See Huff*, 64 Wn. App. at 646; *State v. Stebbins*, 47 Wn. App. 482, 485, 735 P.2d 1353 (1987) (explaining that courts look to the information "actually known" to the officer "to determine whether probable cause existed to support an arrest on *any* charge").

## CONCLUSION

¶25 We reverse in part and affirm in part the Court of Appeals. There is insufficient evidence in this case to sustain Rose's conviction for possession of an access device within the meaning of RCW 9A.56.010(1). We reverse Rose's conviction on this charge and remand with instructions to dismiss. As to the unlawful possession of a controlled substance charge, we affirm the Court of Appeals' conclusion that probable cause supported Rose's arrest and thus the evidence of his methamphetamine possession was properly obtained. His conviction on that charge stands.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, WIGGINS, and GONZÁLEZ, JJ., concur.