IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No.  35548-9-III |
| OSCAR ALFRED ALDEN, | ) | |
| | ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |

SIDDOWAY, J. — In June 2013, 23-year-old Oscar Alden shot and killed Tom

Maks, allegedly in self-defense.  Although Mr. Maks entered, without permission, the

home where Mr. Alden was staying, and accosted and threatened Mr. Alden and other

house guests to the point that someone called police, a jury rejected Mr. Alden's claim of

self-defense and found him guilty of second degree murder.  The trial evidence was

detailed in our decision in Mr. Alden's direct appeal.  *See State v. Alden*, No. 32695-1-III

(Wash. Ct. App. Mar. 8, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf

/326951.unp.pdf.

In a personal restraint petition, Mr. Alden now contends he received ineffective

assistance of counsel when his trial lawyers failed to investigate whether his attention

deficit hyperactivity disorder (ADHD) affected his psychological state at the time of the

shooting.  His evidence does not support his contention that any failure to investigate

constituted ineffective assistance of counsel in connection with the trial.  It is sufficient to

No. 35548-9-III
*In re Pers. Restraint of Alden*

support referral for a reference hearing on the issue of whether a failure to investigate

constituted ineffective assistance of counsel in connection with his sentencing.  We deny

the petition in part and remand for a reference hearing.[1]

PROCEDURAL HISTORY

*Mr. Alden's theory of self-defense and its failure at trial*

Oscar Alden was a college student with no criminal history when he and a number

of others were invited to travel to the family vacation home of Dayton Wiseman on a

weekend in June 2013, to celebrate Mr. Wiseman's birthday.  That same weekend, Tom

Maks was staying at his family's vacation home next door.

---

[1] Mr. Alden also advances an argument he supplementally briefed in his direct appeal: that he should be resentenced in light of *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), which he argued significantly changed the law by holding that youth can be considered a mitigating factor and the basis for an exceptional sentence.  He argued on direct appeal that "[u]nder normal retroactivity rules, the *O'Dell* decision is retroactively applicable to all cases that are not yet final."  Supplemental Br. of Appellant, No. 32695-1-III, filed Sep. 30, 2015, at 1.

We rejected the argument in the direct appeal.  *Alden*, slip op. at 33 n.4.  The Washington Supreme Court has since held that *O'Dell* does not constitute a significant change in the law for purposes of the one-year time bar under RCW 10.73.090(1) but did not reach whether it applies retroactively.  *In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 338, 422 P.3d 444 (2018).

Petitioners are generally prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of the issue. *State v. Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004).  The interests of justice do not require relitigation of the issue here.  That being said, if this court ultimately orders resentencing so that Mr. Alden can present evidence of his ADHD as a mitigating factor, we would not view him as foreclosed from presenting related evidence on brain development associated with his youth.

On Saturday, Mr. Maks introduced himself to some of the Wiseman house guests, trading marijuana for some of Raymond Roberts's ammunition, and trying, unsuccessfully, to barter for some of Mr. Alden's Adderall. Mr. Alden is prescribed Adderall to treat his ADHD.

When evening arrived, one of the Wiseman house guests invited Mr. Maks to join them in traveling to Chelan for drinks. Mr. Maks caught a ride with Eric Hansen, and during the evening, Mr. Maks treated the Wiseman house guests to rounds of margaritas. According to Mr. Hansen, when he collected his passengers for the drive back to the Wiseman home, Mr. Maks "seemed to make indications that he was going to take a cab or, some other way, he didn't want to leave essentially." Report of Proceedings (RP)[2] at 979. Mr. Hansen and his other passengers left without him.

It turned out that being left behind angered Mr. Maks, leading him to an extended confrontation of the Wiseman house guests that ended when he was shot by Mr. Alden. In Mr. Alden's trial for the second degree murder of Mr. Maks, the jury heard from many of the house guests about how Mr. Maks entered the Wiseman home at around 3 o'clock Sunday morning—uninvited, drunk and angry. They heard evidence that he was loud, verbally abusive, and made profane threats of violence. He allegedly awakened two

---

[2] References to the Report of Proceedings are to the report of the trial proceedings filed in Mr. Alden's direct appeal.

house guests by aggressively shaking them and upended a reclining chair in which Mr. Alden had been sleeping. House guests became aware that Mr. Maks was armed with a handgun during the intrusion, either because they saw it tucked in the back of his pants, or heard about the gun from others who had seen it. House guests testified to being "very scared," "frightened," "alarm[ed]," and "terrifi[ed]" by Mr. Maks's erratic, threatening, behavior. RP at 427, 442, 456, 542, 592, 796. One of the house guests called police. Mr. Maks's confrontation with the Wiseman house guests ended when he was shot by Mr. Alden.

Evidence would support Mr. Alden's claim that Mr. Maks created a frightening and disorienting situation leading up to the shooting. It would support Mr. Alden's claim that before shooting Mr. Maks, Mr. Alden heard and believed that Mr. Maks was carrying a handgun. It would support Mr. Alden's claim that eventually, when his friends Raymond Roberts and Dane Meier became involved in a physical fight with Mr. Maks on a downstairs patio near the driveway where guests had parked their cars, Mr. Roberts called to Mr. Alden to get his (Mr. Alden's) handgun. It would support Mr. Alden's claim that after retrieving his gun from his car and loading it, he approached the patio area with apprehension. But the jury did not accept Mr. Alden's claim that when he came within sight of Mr. Maks on the ground, Mr. Alden reasonably believed that Mr. Maks was still armed and lunged at him.

4

The jury heard from three eyewitnesses who were in the immediate vicinity when Mr. Alden fired the fatal shot, and their testimony was not helpful to his claim of self-defense. Two of Mr. Alden's friends, Mr. Meier and Mr. Roberts, testified that following the 3 o'clock intrusion, they escorted Mr. Maks out of the Wiseman home and watched him walk to his family's home next door. They were still standing outside on a small patio below a deck, waiting for police, when Mr. Maks returned moments later. Mr. Maks continued to be verbally abusive, prompting Mr. Roberts to say, "If you didn't have your gun on you I would kick your ass right now." RP at 508. Mr. Maks turned in a circle, demonstrating as he took his shirt off that he was no longer carrying a handgun. He then stripped down to his underwear, taunting Mr. Roberts that he was taking his pants off, "so you can suck my dick." RP at 456.

According to Mr. Roberts and Mr. Meier, Mr. Maks became increasingly verbally aggressive and then became physical, striking Mr. Meier hard on the side of the head with an open palm. Mr. Meier struck him back, causing Mr. Maks to fall or stumble backwards. Mr. Roberts then joined the fight, punching Mr. Maks with a closed fist. Mr. Maks fell back, struck a deck post, and then fell forward onto the ground, where Mr. Roberts straddled him and continued to punch him in the side of the head, about eight times total. A female house guest who saw part of the fray from inside the house described Mr. Roberts as "start[ing to] beat[ Mr. Maks] up." RP at 612. According to Mr. Meier and Mr. Roberts, Mr. Maks was on the ground, his head down and his hands

5

"kind of by his head, kind of protecting himself," when Mr. Roberts stopped punching him, stood up, and stepped away. RP at 516-17.

Mr. Roberts testified that Mr. Maks was lying "relatively still," only "[b]reathing, hands across the gravel, things like that," when Mr. Alden—who had retrieved his gun after Mr. Roberts yelled for him to do so—walked quickly toward Mr. Maks, his gun drawn. RP at 522. Mr. Roberts testified that after getting "very, very close . . . [Mr. Alden] kinds of leans back, and that's when the shot was fired." RP at 524. Asked if Mr. Maks was lunging at the time he was shot, Mr. Roberts answered, "I don't believe so, no." RP at 526. He testified that Mr. Maks might have been reaching up with a hand "a little bit," but with "no major movements," and recalled "his head being fairly still." *Id.* Mr. Roberts did not believe that Mr. Maks was trying to stand up. Asked about what he did immediately after Mr. Alden shot Mr. Maks, Mr. Roberts testified, "It was completely surreal to me. I, I couldn't breathe very well and I, I said, 'You shot him.'" RP at 527. He testified that he recalled pacing up and down the driveway and "was in disbelief." RP at 528.

Mr. Meier's testimony was that after Mr. Roberts stopped punching Mr. Maks and stepped away, Mr. Maks had been "crunched down," "[o]n his knees," but was moving. RP at 407, 420. He testified that Mr. Maks "wasn't like laying completely in, you know, a ball, but he wasn't, you know, he wasn't upright, it was somewhere in between." RP at 408. He described Mr. Maks's movement as "fairly subtle," and said he could see that

6

Mr. Maks was trying to get up. RP at 411. Asked if Mr. Maks was lunging at anyone when Mr. Alden shot him, Mr. Meier answered, "No. No." RP at 419. He described Mr. Alden as "walking briskly" toward Mr. Maks, holding his gun with both hands and arms extended, and as then shooting Mr. Maks from a distance of about two feet. RP at 415.

Most damaging was the testimony of Andrew Ross. Mr. Ross, concerned about his own and the other guests' safety, had already armed himself with a handgun and had walked his girlfriend a block away so that she could await the arrival of police from a safer spot. When he hurried back to the Wiseman house, he encountered Mr. Alden retrieving his own handgun from his car. After Mr. Alden retrieved and loaded his gun, Mr. Ross described himself and Mr. Alden as walking within "a couple feet" of each other as they passed the vehicles parked near the patio area to see what was happening between Mr. Roberts, Mr. Meier, and Mr. Maks. RP at 692-93. When the two rounded the back of a truck together, "pretty close to being side-by-side" according to Mr. Ross, he could see that Mr. Maks was lying on the ground, so he lowered his gun. RP at 695. He testified that the "[b]est [he] could describe" Mr. Maks's position was "you know, Muslim prayer position where your feet are kind of tucked under you, you know, butt on your feet, body kind of laid out at a bit of an angle with his head on the ground." RP at 699-700. He testified that Mr. Maks was not moving.

He testified that Mr. Alden then took "maybe one or two more steps and fluidly kind of pulled the gun up with one hand and pulled the trigger." RP at 698. Mr. Ross

7

described his own reaction to the shooting as "very shocked." RP at 711. At that point, Mr. Ross testified, he was "[a] little bit [afraid]" of Mr. Alden, and told him to take the magazine out of his gun, which Mr. Alden did. RP at 712-13.

At trial, Mr. Alden testified, consistent with his self-defense claim, that before he pulled the trigger Mr. Maks made a sudden movement "like a football player lunging to tackle me." RP at 1130. He testified that he believed Mr. Maks was still armed and denied seeing that he had stripped down to his underwear. He presented testimony from both a medical expert and a firearm expert to support his self-defense claim. His medical expert testified, based on autopsy results, that Mr. Maks had his arm up and in front of him at the time the bullet struck him. His firearm expert testified that when Mr. Alden fired his gun he was between three and six feet away from Mr. Maks, and Mr. Maks had his left hand raised in the air.

In closing argument, the State compared Mr. Alden's alleged belief about the danger presented by Mr. Maks to the perception of the other witnesses in the immediate vicinity:

> The other three people present knew that Tom was not a threat. Ray had stopped beating on Tom and had stood up and moved away. And Dane, too. Dane, too, had moved away. But when we start looking at okay, so, Oscar says these things but are they reasonable? Let's look at what the other person who was present did. The other person who was armed with a firearm . . . . What did Andrew do under the same circumstances, not similar circumstances, same circumstances? He was upstairs. He heard and saw Tom upstairs. He heard the loud thud when Oscar was upended. He knew what was going on, he knew about the fight

out front, he knew these things. Andrew knew the same thing essentially that Oscar did, but what did Andrew do? After he rounded the truck he cautiously approached, took his time to make sure that he was not in danger, that he was not going to shoot other people in the dark, and he approached the scene with caution. That's what the reasonable person did that night.

RP at 1400-02.

The jury found Mr. Alden guilty of second degree murder.[3] At Mr. Alden's sentencing hearing, he requested an exceptional sentence of 48 months for the murder, together with 60 months for the firearm enhancement, relying on two statutory mitigating circumstances: that "[t]o a significant degree, the victim was an initiator, willing participant, aggressor, or provoker of the incident," and that "[t]he defendant committed the crime under duress, threat or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct." RCW 9.94A.535(1)(a), (c).

After hearing argument and considering the many letters and statements from family and friends of both Mr. Alden and Mr. Maks, the trial court refused the defense request for an exceptional sentence, explaining:

I thought that Mr. Alden's testimony was dramatically different than those who testified and dramatically different than what happened. I, to this day, don't know why it happened. Maybe Mr. Alden doesn't, I don't know. I suspect that Mr. Maks' mother and father will never know why it happened. But the concern that the Court has is that sentencing Mr. Alden, no matter how or what kind of life that Mr. Alden has led up to this particular point, sentencing him below the standard sentencing range would

---

[3] It also found him guilty of first degree manslaughter, but that charge was dismissed to avoid double jeopardy.

rightfully be offensive to Mr. Maks' parents and family and friends, and clearly his daughters. I think sentencing Mr. Alden below the standard range would be offensive to the jury's struggle in this particular matter. I recognize they didn't struggle very long, but I know that they struggled because only one juror stuck around to talk to me and that juror told me that most of the people had to go home because they were emotional, and this is the kind of case that you get emotional in.

RP at 1562-63. The court followed the State's recommendation, imposing a midrange sentence of 231 months.

Mr. Alden's judgment and sentence was affirmed on direct appeal. His petition for review was denied.

PERSONAL RESTRAINT PETITION

Mr. Alden filed the present personal restraint petition (PRP), his first, within a year of this court issuing the mandate. He seeks relief from personal restraint in the form of his conviction and sentence, arguing that because he received ineffective assistance of counsel, the conviction and sentence violate the federal and state constitutions and state sentencing law. Pointing out that his trial lawyers quickly decided to assert justifiable self-defense and were aware from the outset that he had been diagnosed with ADHD, Mr. Alden argues that they should have investigated the effect of ADHD on his thinking. If they had, he argues, they would have had an answer to why he reacted differently to circumstances presented in the early hours of June 9 on the poorly-lit Wiseman patio than did Mr. Roberts, Mr. Meier, and most importantly, Mr. Ross.

10

To obtain relief in a PRP, a petitioner must show actual and substantial prejudice resulting from alleged constitutional errors, or for alleged nonconstitutional errors a fundamental defect that inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). To avoid dismissal, the petition must be supported by facts and not merely bald or conclusory allegations. *Id.* at 813-14; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). A "petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." *Id.*

### *Evidence offered in support of the PRP*

Mr. Alden's evidence in support of his petition consists of the record of the trial proceedings and three supplemental declarations. A supplemental declaration of James Lobsenz, who represented Mr. Alden in his direct appeal and represents him in the PRP, explains that he was unable to obtain testimony from Mr. Alden's lead trial lawyer, Max Harrison, who died during the direct appeal. It states that Mr. Harrison provided Mr. Lobsenz with his trial file before he died, and Mr. Lobsenz found nothing in Mr. Harrison's file to suggest that he ever retained, contacted, or thought about retaining or contacting any expert witness who could advise him about the effect that ADHD might have had on Mr. Alden's thought processes. Mr. Lobsenz acknowledges that the trial record contains evidence that the firearm expert retained by Mr. Harrison expressed the opinion to Mr. Harrison that Mr. Alden's actions might be explained by a "startle

11

response" but that Mr. Harrison made a strategic decision to rely on intentional, justifiable self-defense.

Mr. Lobsenz's declaration states he was unable to obtain testimony from William Fligeltaub, who Mr. Harrison associated to serve as second chair at trial. Mr. Lobsenz states he spoke with Mr. Fligeltaub, who originally agreed to provide a declaration stating he never made a strategic decision not to present evidence that ADHD could be relevant to self-defense. Mr. Fligeltaub later changed his mind and declined to provide a declaration. Mr. Lobsenz acknowledges that Mr. Fligeltaub produced his file from the trial, and it contained five documents about medications for the treatment of ADHD, two articles about ADHD or ADHD medications, and three "'documents' (pages stapled together) that seem to be the results of a more generalized search for information about ADHD." Decl. of Lobsenz at 16. Mr. Lobsenz states he found nothing in Mr. Fligeltaub's file suggesting that Mr. Fligeltaub ever contacted Mr. Alden's mother, his treating psychologist, or his college about Mr. Alden's ADHD, however, or that he ever performed relevant legal research or contacted a psychologist or doctor to obtain an evaluation.

Mr. Alden further supports his petition with a declaration from Natalie Novick-Brown, PhD, who was retained to evaluate Mr. Alden in August 2017. Based on her evaluation, Dr. Novick-Brown agreed with Mr. Alden's treating psychologist's diagnosis of his ADHD and testified that Mr. Alden has impairments in six "cognitive domains:

12

auditory learning and memory, visuospatial construction, impulsivity, processing speed,

motor functioning, executive function (i.e., perseveration), and intellectual functioning."

Decl. of Novick-Brown at 9. She testifies that Mr. Alden displays

> numerous cognitive deficits, including very slow processing speed and significant impulsivity and perseveration. In general, he has substantial trouble taking in complex visual information (i.e., what's going on in the environment) and difficulty seeing the "whole" picture versus the details. Multitasking is problematic for him, which becomes increasingly problematic with environmental complexity. He tends to react without allowing himself sufficient time to process new situation. As such, he is prone to interpretation errors.

*Id.* at 16-17.

Dr. Novick-Brown's declaration identifies eight "consultative questions" she was

asked by Mr. Lobsenz to address, one of which asked whether Mr. Alden's ADHD was

"relevant to the subjective prong of the defense of self-defense," and another that asked

whether it was "relevant to the objective prong of the defense of self-defense." *Id.* at 2.

She answered yes in both cases. In answering that Mr. Alden's ADHD was relevant to

the objective prong of self-defense, she states in relevant part:

> Although Mr. Alden testified about what he *believed* was occurring during the offense, the jury did not hear how the impairments associated with his ADHD impaired his capacity to quickly process and understand chaotic events, formulate valid impressions, and reach a rational decision, particularly when he was in a highly anxious state.
> . . . Considering Mr. Alden's personal physical and mental characteristics, the substantial impairments associated with his ADHD prevented him from thinking rationally in such a context. In other words, his cognitive capacity to form "reasonable" beliefs and perceptions was substantially impaired due to his ADHD.

*Id.* at 40.

Finally, Mr. Alden supports his petition with a declaration from Todd Maybrown, an experienced criminal defense lawyer. Mr. Maybrown expresses the view that Mr. Alden's trial lawyers provided deficient performance by failing to present evidence about ADHD that could have addressed the State's argument that Mr. Alden did not reasonably believe he was in imminent danger at the time of the fatal shot. He expresses the view that Mr. Alden was prejudiced both at trial and at sentencing. He was prejudiced at trial, Mr. Maybrown opines, because nothing was offered that would allow the jurors to place themselves in Mr. Alden's shoes. He expresses the opinion that Mr. Alden was prejudiced at sentencing because the lawyers were unable to point to evidence that his capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired—a mitigation factor under RCW 9.94A.535(1)(e).

*Applicable law and the State's response*

Effective assistance of counsel is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995). Effective representation includes a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691. To demonstrate ineffective

assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (emphasis omitted) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)). If a defendant is unable to make one of the required showings, we need not address the other. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

We review a claim of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). The review begins with a strong presumption that counsel's representation was effective. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

The State challenges the petition on three grounds. It first argues that Mr. Alden's evidence falls short of the required demonstration of facts entitling him to relief, since he does not prove that the possible relevance of ADHD was *not* considered by his lawyers. It next argues that the existing record demonstrates that pursuing a defense of intentional self-defense was legitimate trial strategy. Its third challenge is that Mr. Alden fails to demonstrate that he was prejudiced by his trial lawyer's failure to obtain the type of expert testimony provided by Dr. Novick-Brown.

ANALYSIS

Different analyses are required when considering the alleged failure to investigate for purposes of trial and for purposes of sentencing. We begin by considering the alleged failure to investigate for purposes of trial.

I.    DEFICIENT REPRESENTATION FOR TRIAL PURPOSES IS NOT SHOWN

It was not deficient performance to fail to investigate whether ADHD impeded Mr. Alden's rational assessment of the danger presented by Mr. Maks. Such evidence would have undercut, not advanced, a claim of justifiable self-defense.

In Washington, self-defense is defined by statute. *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993). Washington's justifiable homicide statute provides in relevant part that homicide is justifiable when committed

> [i]n the lawful defense of the slayer, . . . when there is *reasonable ground* to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished.

RCW 9A.16.050(1) (emphasis added). Washington's general self-defense statute provides in part that the use of force upon or toward the person of another is not unlawful "[w]henever used by a party about to be injured . . . in preventing or attempting to prevent an offense against his or her person, . . . in case the force is not more than is necessary." RCW 9A.16.020(3). "Necessary" is defined for purposes of chapter 9A.16 RCW to mean "that no reasonably effective alternative to the use of force appeared to

16

exist and that the amount of force used was *reasonable* to effect the lawful purpose intended." RCW 9A.16.010(1) (emphasis added).

The longstanding rule in Washington is that evidence of self-defense must be assessed from the standpoint of the reasonably prudent person, "knowing all the defendant knows and seeing all the defendant sees." *Janes*, 121 Wn.2d at 238 (citing *State v. Allery*, 101 Wn.2d 591, 594, 682 P.2d 312 (1984)). The self-defense standard includes "both objective and subjective elements." *State v. Walden*, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997). The subjective component "requires the jury to stand in the shoes of the defendant and consider all the facts and circumstances known to him or her." *Id.* The objective component requires the jury to use the information from the subjective analysis "to determine what a reasonably prudent person similarly situated would have done." *Id.*

Given the subjective component, Mr. Alden's lawyer was able to argue to jurors that Mr. Alden did not know or see everything that Mr. Roberts and Mr. Meier knew or had seen during their contact with Mr. Maks on the patio before Mr. Alden arrived. Had an expert like Dr. Novick-Brown been engaged, the State identifies no reason why she would not have been able to explain to jurors the irrational, unreasonable way in which, given Mr. Alden's deficits, he might process what he knew and was seeing.

But given the objective component of self-defense, evidence that Mr. Alden's ADHD could lead him to respond irrationally and unreasonably would have been more of

a problem than a help. This is perhaps most clearly demonstrated by *State v. Hughes*, 106 Wn.2d 176, 721 P.2d 902 (1986), in which the Washington Supreme Court held that a theory of "imperfect self-defense"—a defense available in some jurisdictions to reduce a murder charge to manslaughter—is not available in Washington. "Imperfect self-defense" is self-defense based on an *honest* but *unreasonable* belief that the facts support self-defense. *Id.* at 188. *Hughes* holds that "[t]he statutory definitions of self-defense and manslaughter in Washington provide no room for the theory advocated by the defendant that an honest (or good faith) but unreasonable belief that self-defense is necessary merits leniency." *Id.* at 190. The definition of self-defense provides no room for the theory because it would omit the essential element that the person using force must *reasonably* believe that he or she is in danger. *Id.* at 189.

*Janes* also emphasizes the importance under Washington law of the objective, normative portion of the self-defense inquiry:

> The objective portion of the inquiry serves the crucial function of providing an external standard. Without it, a jury would be forced to evaluate the defendant's actions in the vacuum of the defendant's own subjective perceptions. In essence, self-defense would always justify homicide so long as the defendant was true to his or her own internal beliefs.

121 Wn.2d at 239. The *Janes* court quotes approvingly Professor Susan Estrich's observation that "'[i]f the reasonable person has all of the defend[ant]'s characteristics, the standard loses any normative component and becomes entirely subjective.'" *Id.* at

240 (first alteration in original) (quoting Susan Estrich, *Defending Women*, 88 MICH. L.

REV. 1430, 1435 (1990) (reviewing CYNTHIA GILLESPIE, JUSTIFIABLE HOMICIDE:

BATTERED WOMEN, SELF-DEFENSE AND THE LAW (1989))).

Mr. Alden argues that Washington cases dealing with the prosecution of persons

suffering from "battered woman" or "battered child" syndrome support his position that

jurors can be asked to put themselves inside an irrationally-operating mind in assessing

whether a use of force was justifiable. Those cases might seem analogous if one views

them as exculpating the battered person based on a *disability* of the battered person. But

given Washington's definition of self-defense, those cases are properly understood as

exculpating the battered person not based on any disability, but based on the

*reasonableness* of the battered person's response.

Professor Paul Robinson has outlined a system of five categories of defenses under

which self-defense qualifies as a justification and the cognitive deficits identified by Dr.

Novick-Brown would qualify as an excuse. 1 PAUL H. ROBINSON, CRIMINAL LAW

DEFENSES § 21, at 70 (1984).[4] He explains that an excuse defense is available when a

*disability* (the abnormal condition of the actor at the time of the offense) causes an

*excusing condition* (the effect of the disability creates a condition that renders the

---

[4] His three other categories of defenses are failure or proof defenses, offense modification defenses, and nonexculpatory defenses. *See* 1 ROBINSON, *supra*, § 21, at 70.

defendant blameless). *Id.* § 25(b), at 92. Professor Robinson explains that justifications

and excuses may seem similar in that both are general defenses that exculpate an actor

because of his blamelessness. *Id.* § 25(d), at 100. He explains that there remains an

important conceptual distinction, however:

> Justified conduct is correct behavior that is encouraged or at least tolerated. In determining whether conduct is justified, the focus is on the *act*, not the actor. An excuse represents a legal conclusion that the conduct is wrong, undesirable, but that criminal liability is inappropriate because some characteristic of the actor vitiates society's desire to punish him. Excuses do not destroy blame, as do [justifications and two other classes of defense]; rather, they shift it from the actor to the excusing conditions. The focus in excuses is on the *actor.* Acts are justified; actors are excused.

*Id.* § 25(d), at 100-01.

Battered person cases deal with syndromes that are a subset of post-traumatic

stress disorder (PTSD), and "[a]lthough PTSD is classified as a mental disorder, 'it is one

of the few kinds of psychiatric disorders that is considered a *normal response* to an

*abnormal situation.*'" *Janes*, 121 Wn.2d at 233 (quoting PAUL A. MONES, WHEN A

CHILD KILLS: ABUSED CHILDREN WHO KILL THEIR PARENTS 63 (1991)). It is "'an

anxiety-related disorder which occurs in response to traumatic events outside the normal

range of human experience.'" *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994)

(quoting *Janes*, 121 Wn.2d at 233). Expert testimony is admitted in such cases not to

offer an actor-based excuse for irrational behavior, but to show how severe abuse in the

context of a battering relationship affects the victim's perceptions and reactions in ways

not immediately understandable to the average juror. *Id.* "The battered person syndrome is admitted in self-defense cases to illustrate and explain the 'reasonableness' of the defendant's actions." *Id.* (citing *Allery*, 101 Wn.2d at 596-98).

In a homicide involving persons in a battering relationship, expert testimony provides jurors with particular perceptions held by battered persons that are recognized by the mental health profession. Armed with information about recognized perceptions commonly held by battered persons, jurors can assess, on an objective basis, whether a given defendant's conduct was reasonable. Dr. Novick-Brown, by contrast, does not offer scientifically-recognized perceptions of a person with ADHD that jurors could consider along with other evidence in assessing whether Mr. Alden's conduct was objectively reasonable. In fact, she offers her expert opinion that Mr. Alden's cognitive deficits can explain why he reacted in a way that was not rational or reasonable.[5]

Mr. Alden does not question the decision of his trial lawyers to rely on the defense of self-defense. Given that defense, his trial lawyers did not perform deficiently in failing to investigate the availability of an expert who could offer a cognitive impairment excuse,

---

[5] Again, she states in relevant part that the impairments associated with Mr. Alden's ADHD "impaired his capacity to quickly process and understand chaotic events, formulate *valid* impressions, and reach a *rational* decision, particularly when he was in a highly anxious state"; she stated that the substantial impairments associated with Mr. Alden's ADHD "prevented him from thinking *rationally*" when presented with chaotic events and that "his cognitive capacity to form '*reasonable*' beliefs and perceptions was substantially impaired." Decl. of Novick-Brown at 40 (emphasis added).

21

but not a justification, for his actions. The testimony of such an expert could help persuade jurors that Mr. Alden's testimony about his subjective belief was credible, but the bigger defense problem was dealing with a shooting that appeared to be objectively unreasonable. Testimony about Mr. Alden's cognitive deficits would have strengthened the State's argument that the shooting was objectively unreasonable.

Once a reasonable decision was made to assert self-defense, Mr. Alden's lawyers' duty to investigate whether a psychological evaluation would support deficits in his ability to respond reasonably was, for trial purposes, at an end. *Cf. Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998) (once defense counsel *reasonably* chooses a defense theory, his duty to investigate a conflicting defense is at an end).

II.     A REFERENCE HEARING IS REQUIRED ON WHETHER MR. ALDEN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

A trial court may impose an exceptional sentence below the standard range for a number of reasons. In Mr. Alden's sentencing memorandum, his lawyers described some of his characteristics that would make many judges seriously consider leniency: he had no criminal history, he had responded with "fundamental fairness" when examined and cross-examined during trial, his friends had described him during trial "in general terms of quiet, calm, even-tempered, and never even raising his voice," and until the weekend of June 7-9, 2013, he had been a full-time college student. Clerk's Papers at 415.

The two mitigating factors that Mr. Alden identified for the trial court as supporting a reduced sentence depended on pointing to Mr. Maks as an initiator, aggressor or provoker of what came to pass and arguing that if Mr. Alden was not in imminent danger, he was at least under duress, threat or compulsion. Both factors essentially attributed part of the responsibility for Mr. Maks's death to Mr. Maks. The trial court rejected this mitigation argument, explained its view that sentencing Mr. Alden below the standard sentencing range would "rightfully be offensive" to Mr. Maks's family and friends and "to the jury's struggle in this particular matter." RP at 1563.

As Mr. Alden argues, expert testimony on his ADHD would have supported a third statutory mitigating circumstance that would admit he had fired the fatal shot unreasonably but would offer an explanation. Under RCW 9.94A.535(1)(e), it is a mitigating circumstance if "[t]he defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired." A mental condition not rising to insanity or diminished capacity may support an exceptional sentence downward if the defendant can show the existence of a mental condition and "the requisite connection between the condition and significant impairment of the defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law." *State v. Schloredt*, 97 Wn. App. 789, 802, 987 P.2d 647 (1999). As Mr. Alden points out, providing expert evidence on his

impairment would have answered a question that appeared to trouble the trial court when

it stated, during sentencing:

> I thought that Mr. Alden's testimony was dramatically different than those who testified and dramatically different than what happened. *I, to this day, don't know why it happened. Maybe Mr. Alden doesn't, I don't know.*

RP at 1562-63 (emphasis added).

We can see now that the type of information that Dr. Novick-Brown provided, if

found credible by the trial court, might have proved more persuasive than the mitigation

case that was presented by Mr. Alden's lawyers. But it does not follow that Mr. Alden's

lawyers performed deficiently. "A fair assessment of attorney performance requires that

every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Strickland*, 466 U.S. at 689. When assessing whether

a lawyer's investigation was reasonable, we must consider "whether the known evidence

would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510,

527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

Our review of reported and unreported cases from other jurisdictions satisfies us

that a diagnosis of ADHD has often been raised by criminal defendants as relevant to

competency or culpability.[6] Mr. Lobsenz points out that our Supreme Court's recent

---

[6] A Westlaw search of state and federal jurisdictions using the search terms

24

decision in *In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 332, 422 P.3d 444 (2018) observed that Mr. Light-Roth's ADHD was argued in mitigation at his sentencing in 2004. It has been suggested that an ADHD diagnosis is not compelling mitigation evidence when it appears in conjunction with a defendant's other mental deficits and prior brushes with the law, because it tends to depict a defendant as unstable and unable to control his actions. *E.g.*, *Littlejohn v. Royal*, 875 F.3d 548, 560-62 (10th Cir. 2017) (citing cases), *cert. denied*, ___ U.S. ___, 139 S. Ct. 102, 202 L. Ed. 2d 65 (2018). Unlike the cases discussed in *Littlejohn*, however, Dr. Novick-Brown's evidence in this case would provide an explanation for behavior that was aberrant for Mr. Alden.

We are not prepared to grant Mr. Alden a new sentencing hearing without first requiring a reference hearing because, as the State points out, whether Mr. Alden's trial lawyers provided deficient representation is fact-specific and we lack potentially important evidence. We lack testimony from Mr. Fligeltaub[7] and Mr. Alden. It may be that the possible relevance of Mr. Alden's ADHD was discussed between him and his lawyers, and investigation was not pursued for a good reason. We do not know whether

---

"sentencing and ADHD /p (reason! process! rational! assess! impulsiv!) and mitigat!" yielded 240 published and unpublished decisions.

[7] We reject the State's argument that the failure to provide a declaration from Mr. Fligeltaub is fatal to the petition. The absence of a declaration is adequately explained by Mr. Lobsenz.

25

Mr. Alden discounted the effects of his disorder or stated that it was controlled by medication.[8]  We do not know whether Mr. Alden's ADHD was fully or substantially controlled by medication at the time of the murder.  We do know that when interviewed within hours of the shooting, Mr. Alden told a detective that if his blood was drawn, it would test positive for Adderall.  The State has not had an opportunity to cross-examine or otherwise challenge Dr. Novick-Brown's opinions.

Accordingly, we remand for a reference hearing at which evidence can be presented on whether Mr. Alden's trial lawyers did investigate the possible relevance of his ADHD to sentencing; if so, to what extent; the reasons, if any, for not pursuing further information or an evaluation; the persuasiveness of Dr. Novick-Brown's opinions; and any other matters relevant to whether defense counsel's representation in connection with sentencing was deficient and prejudiced Mr. Alden at sentencing.

A hearing on this matter shall be held within 90 days of the date this opinion is filed unless the superior court determines that additional time is needed.  In that event, the superior court may grant additional time, provided the court or the parties advise this court of any delay and the reasons.  Following the hearing, counsel shall promptly forward to this court copies of the written findings and conclusions together with the clerk's papers and transcripts of the hearing.  Counsel may request permission to file

---

[8] We are not suggesting that if Mr. Alden discounted the importance of the disorder it would necessarily excuse his lawyers from further investigation.

26

supplemental briefing in this court. This court will then determine the proper disposition of Mr. Alden's petition on the remaining issue of ineffective assistance of counsel at sentencing.

We deny the petition insofar as it challenges the constitutionality of Mr. Alden's conviction. We remand to the superior court for proceedings consistent with this opinion. Having ordered a reference hearing, we deny Mr. Alden's motion for leave to depose Mr. Fligeltaub.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

27